UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW J. DAVID,

    Plaintiff,

v.                                                                             Case No. 8:23-cv-1921-KKM-AEP

GENERAL DYNAMICS
INFORMATION TECHNOLOGY,
INC.

    Defendant.
_____

## ORDER

Plaintiff Matthew J. David sues General Dynamics Information Technology, Inc., (GD) for intentional interference with a business contract, tortious interference with a business relationship, defamation per se, defamation, and aiding and abetting tortious interference and defamation. Am. Compl. (Doc. 72). David's claims arise out of events that occurred during his employment with GD. *See generally id.* GD moves to dismiss the amended complaint, or in the alternative moves for a more definite statement for certain claims. Mot. to Dismiss (Doc. 76) (MTD). For the reasons below, I grant in part and deny in part the motion.

I.  BACKGROUND

GD is a government contractor. Am. Compl. ¶ 6. It "provides consulting, technology, and mission-support services to federal agencies, including the United States Special Operations Command ('USSOCOM')." *Id.* In December 2018, the General Service Administration (GSA) awarded GD with a Contract to "oversee USSOCOM's Web Operations Support Program and assist USSOCOM's six combatant commands (including [the United States European Command] (EUCOM)) [to] plan and execute psychological operations in their respective geographic locations." *Id.* ¶ 7. GD has been the "prime contractor to USSOCOM under the [] Contract." *Id.* ¶ 8.

GD employed David as the EUCOM Team Lead for the Contract. *Id.* ¶ 9. Because of his position as Team Lead, GSA classified him as "key personnel," which prohibited GD from "unilaterally" removing him from his position. *Id.* As Team Lead, David "supervised a team of approximately 30 GD[] employees and subcontractors" and briefed "high-level military and intelligence community officials." *Id.* ¶¶ 9–10. GD rated David's performance as "exceptional" in 2019 and

"valued" in 2021 and 2022. *Id.* ¶ 11. "[T]he 'customer community,' which included USSOCOM, EUCOM, and GSA [], held [David] in high esteem." *Id.*

For "weeks and months" leading up to the Contract's periodic re-compete process in June 2023, one of GD's "primary competitors," Peraton, Inc., approached David about "an opportunity to join Peraton's team as 'key personnel' " for the re-compete. *Id.* ¶ 12. Peraton made David an offer of employment on March 21, 2023, and David accepted two days later. *Id.* Before accepting the offer and while he was considering it, David attended a business conference for GD in Germany in January 2023. *Id.* ¶ 13. David's coworkers Lukas Anderson and Shannon Welch also attended. *Id.*

While on the Germany trip, David "observed Welch engage in what appeared to be an inappropriate relationship" with Sgt. Patrick Barense, who was stationed at EUCOM headquarters in Stuttgart, Germany. *Id.* ¶¶ 10, 15. At one point, David saw "Barense leave Welch's hotel room late at night under circumstances that suggested there had been a sexual encounter." *Id.* ¶ 15. Because Barense was considered a "member of the 'customer community' for the [] Contract" and therefore a "customer," *id.* ¶ 16, David "recognized the impropriety and inappropriate nature of a current GD[ ] employee . . . engaging in a sexual

3

relationship with a member of the customer community," especially during the re-compete process. *Id.* ¶ 17.

Upon return from the Germany trip, other team members "noticed behavior that suggested Welch and Barense were continuing to carry on an inappropriate relationship." *Id.* ¶ 18. It was observed that Welch and Barense had inappropriate conversations "using the secure video conference terminal located in [David]'s office," and they exhibited conduct suggesting that Welch and Barense "were subverting their ordinary chains of command within EUCOM and GD[]." *Id.*

In February 2023, Welch requested that David assign her to attend a business trip which included a stop in Washington, D.C. *Id.* ¶ 19. Welch's "attendance was not otherwise warranted or appropriate," and David believed it was a "pretext for [Welch] to have a further liaison with Barense" because David knew Barense would attend the D.C. portion of the trip. *Id.* David therefore denied Welch's request. *Id.*

After David denied Welch's request to attend the February trip, Welch submitted a "Request for Employee Relations Support" to GD Human Resources (hereinafter referred to as ER Request). *Id.* ¶ 20. In the ER Request, Welch wrote that David was a "poor representation of a leader" and accused David of having "[c]onversations of a sexual or inappropriate nature"; "[u]sing company trip money

to go on vacations"; "never [being] in the office"; and "ha[ving] [employees] work very long overtime hours." *Id.* In response to the ER Request, GD investigated what it internally categorized as "inappropriate, indecent, or disruptive conduct." *Id.* ¶ 21. David was not investigated for "sexual harassment" or "hostile work environment." *Id.*

The "vast majority" of Welch's allegations were refuted by GD's investigation findings, and many of the allegations were "expressly contradicted or discredited by independent eyewitnesses." *Id.* ¶ 22. Multiple witnesses informed GD during the investigation that Welch was suspected of "engaging in an inappropriate relationship with 'the customer' and that Welch had submitted the ER Request as [a] means of retaliating against [David] for having observed evidence of their relationship." *Id.* Witnesses also informed GD "that they believed Welch had an improper degree of influence with the customer and[ ] that the customer was providing Welch with special treatment and even arranging an office for her at EUCOM headquarters in Stuttgart, Germany." *Id.* During her interviews for the investigation, Welch gave GD "insider or confidential information" that she "knew GD[] was going to lose the bid," that the "competitor (understood to be Peraton) was going to win the

5

[Contract] re-compete," and that David was joining a competitor (which was understood to be Peraton). *Id.* ¶ 23.

GD did not report Welch's relationship with Barense, but "allowed Welch to continue her inappropriate relationship with the customer," and "permi[tted] and encourage[d]" the dissemination of false and misleading information about the investigation to the "customer community." *Id.* ¶¶ 24–25. Because of this, "influential members of the 'customer community' "—including Joe Martin and Anthony Fannin—"began to mistakenly believe that [David] engaged in 'sexual harassment' and was creating a 'hostile work environment.' " *Id.* ¶ 26. On March 27, 2023, after conversations between Martin, Fannin, David's supervisor Jonathan Thurman, and GD's site lead William Florig, USSOCOM provided GD (at GD's request) with "written guidance on how to 'immediately' replace [David] as 'key personnel' for the [] Contract due to 'sexual harassment allegations' and to 'alleviate the hostile work environment.' " *Id.* ¶ 27. Also on March 27, 2023, David informed GD in writing of his resignation, effective April 15, 2023. *Id.* ¶ 29.

GD told the customer, in writing, that it was investigating complaints about David and "otherwise implied that [David] committed the misconduct falsely attributed to him such that it was necessary and appropriate to immediately remove

6

[David] from his 'key personnel' position as EUCOM Team Lead." *Id.* ¶ 28. GD then "submitted a Key Personnel Substitution Request to GSA [] to immediately replace [David] as EUCOM Team Lead and communicated to the customer that [David]'s 'resignation' was being accepted effective immediately." *Id.* ¶ 30. In internal communications, GD expressed that David immediately accepting the resignation would create the "right optic." *Id.* The customer requested twice that David be allowed to work through his notice period, but GD denied the requests and on March 31, 2023, "perp walked" David out of his work facility. *Id.* ¶ 31.

The "predominant and accepted narrative" was that David "was forced to resign due to having engaged in 'sexual harassment' and for creating a 'hostile work environment.'" *Id.* Peraton rescinded David's offer of employment on April 14, 2023, due to what it expressed was "guidance received from the government customer." *Id.* ¶ 32. That guidance apparently involved a "high level EUCOM military official" telling Peraton it would lose the re-compete if David was bid as "key personnel." *Id.* Following David's resignation, GD's vice president told GD agents that they should tell the customer and the selection board assigned with

awarding the Contract what the reasons were for David's resignation. *Id.* ¶ 33. After these events, GD won the re-compete process. *Id.*

David subsequently filed suit against GD, and GD now moves to dismiss his amended complaint. *See* MTD.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss" for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* When considering the motion, the complaint's factual allegations are accepted "as true" and construed "in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

## III. ANALYSIS

### A. Counts III (Defamation Per Se) & IV (Defamation)

GD argues that both defamation counts fail because David inadequately pleads the identity of certain speakers and both counts qualify as shotgun pleadings. MTD at 6–12. The amended complaint brings claims for defamation per se (Count III) and defamation (Count IV), although Count IV includes defamation by implication as well. Am. Compl. ¶¶ 55–69. The defamation claims allege that GD employees made statements or implied that David was involved in misconduct while a GD employee. *Id.*

#### 1. Failure to State a Claim

To plead a defamation claim, the complaint must allege: "(1) publication; (2) falsity; (3) [the] actor must act . . . at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Some decisions in this district

have also required a defamation plaintiff to plead "the identity of the speaker, a description of the statement, and provide a time frame within which the publication occurred" to state a claim. *See, e.g., Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1309 (M.D. Fla. 2021) (quoting *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1328 (S.D. Fla. 2012)), *aff'd*, No. 21-12030, 2021 WL 5858569 (11th Cir. Dec. 10, 2021) (per curiam).

David sufficiently identifies the false publications or implications and who made them for both counts of defamation. Although David caveats that the speakers and statements are "without limitation," Am. Compl. ¶¶ 57, 60–61, 65, 67–68, that does not undermine the specificity of the speakers and statements enumerated. Of course, if David intends to proceed on different publications or implications, he must seek leave to amend his complaint to add those new defamation claims. *See* FED. R. CIV. P. 15(a).

### 2. Shotgun Pleading (Count IV)

As the above suggests, though, David combines two causes of action within one count and it is therefore a shotgun pleading. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) (explaining that one of the four

improper shotgun pleadings occurs when a complaint fails to separate into different counts "each cause of action or claim for relief").

David alleges in Count IV, which is labeled "defamation," that it is an "action for defamation, including by defamation by implication." Am. Compl. ¶ 63. In other words, David attempts to bring more than one kind of defamation action in a single count, though defamation and defamation by implication are often treated as distinct causes of action. *See Jews for Jesus, Inc.*, 997 So. 2d at 1106 (analyzing defamation and defamation by implication as two separate counts); *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1234–37 (Fla. 3d DCA 2021) (same); *compare Mangel v. Daza*, No. 219CV525FTM38MRM, 2019 WL 5068580, at *2 (M.D. Fla. Oct. 9, 2019) (concluding that a complaint "is a shotgun pleading because [the plaintiff] attempts to plead two distinct torts (defamation and defamation by implication) into one count"). Because David articulates different ways these two variations of defamation allegedly occurred, this is a shotgun pleading because it fails to separate into different counts "each cause of action or claim for relief." *Weiland*, 792 F.3d at 1323.

GD argues that Count III is also a shotgun pleading because it contains extraneous allegations that allege defamation by implication, which do not as a matter of law state a claim for defamation per se. MTD at 12. But alleging extraneous

11

facts, though perhaps unnecessary, is not one of the four types of shotgun pleadings, see *Weiland*, 792 F.3d at 1321–23, so the defamation per se claim does not fail for that reason. And at least some of the other allegations plausibly allege a claim for defamation per se. *See Harris v. Plapp*, 386 So. 3d 185, 190 (Fla. 1st DCA 2022) ("When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable per se." (quoting *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978))).

In sum, David must replead Count IV to clarify his causes of action. Upon doing so, David should also consider whether dividing each kind of defamation claim premised on a different publication or implication into a separate count would lend clarity to his complaint.

### B. Counts I (Intentional Interference with Business Contract) & II (Tortious Interference with Business Relationship)

GD contends that both Counts I and II should be dismissed with prejudice under Florida's single action rule because they are premised on the same allegations as the defamation claims. MTD 13–16. David responds that the rule only applies to failed defamation claims, and here his claims have not failed. Resp. at 12–13.

Alternatively, if the single action rule does not bar the tortious interference claims, GD argues that David improperly pleads vague third parties whose relationship was interfered with. MTD 16–19. David responds that the party identities are sufficiently defined. Resp. at 17–18.

### 1. Single Action Rule (Counts I & II)

"In Florida, a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002). The single action rule "does not permit multiple actions when they arise from the same publication upon which a failed defamation claim is based." *Id.*; *see also Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) ("[T]he successful invocation of a defamation privilege *will* preclude a cause of . . . if the sole basis for the latter cause of action is the defamatory publication." (emphasis in the original)). Although Florida courts are "deeply divided" over the application of the single action rule, *Emergency Recovery, Inc. v. Gov't Emps. Ins. Co.*, 773 F. Supp. 3d 1304, 1314 n.4 (M.D. Fla. 2025), the best reading is that "where a defendant has not successfully invoked an affirmative defense to defamation, the single action rule presents no bar to a plaintiff's tortious interference claim premised on the same publication," *id.* at

1320; *see id.* at 1314–20 (explaining why the Florida Supreme Court would likely arrive at this conclusion).

Regardless of how similar the defamation and interference claims may be, the single action rule does not bar the interference claims. Here, the defamation claims have not "failed" for purposes of the single action rule, which requires a successful defense by defendants. *Id.* at 1318 n.10. The defendants have not even attempted to invoke a defense to defamation. And GD does not reference any Florida cases where a similar tort was dismissed because the plaintiff failed to plausibly allege defamation, nor have I located such a case.[1] Therefore, the defamation claims are not barred under the single action rule.

### 2. Failure to State a Claim (Count II)

In Florida, "[t]he elements of tortious interference with a business relationship are '(1) the existence of a business relationship; (2) knowledge of the relationship on

---

[1] In *ERI v. GEICO*, I noted that in *Byrd v. Hustler Magazine, Inc.*, "the Fourth District Court of Appeal concluded that the defamation claim failed because the publication was 'neither false nor defamatory' and that the 'invasion of privacy claim' also failed because it 'was based on the same factual allegations and legal argument.'" 773 F. Supp. 3d at 1318 n.10 (quoting 433 So. 2d 593, 595 (Fla. 4th DCA 1983)). But I explained that "*Byrd* can be read to hold that the invasion of privacy claim failed on the merits, not because of the single action rule." *Id.* (citing *Jews For Jesus, Inc.*, 997 So. 2d at 1106 (stating that "the elements of these two torts are remarkably similar")).

14

the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (omission adopted) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985) (per curiam)). "[N]o cause of action exists for tortious interference with a business's relationship to the community at large." *Id.* at 815. The business relationship must be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.*

The tortious interference claim adequately identifies Peraton. But David's allegations concerning "other similarly situated companies engaged in the relevant government contracting industry, and the 'customer community' as a whole," Am. Compl. ¶ 48, fail because there is "no cause of action" for "interference with a business's relationship to the community at large," *Ethan Allen*, 647 So. 2d at 815. Although David's allegation that the "customer community" includes USSOCOM, EUCOM, and GSA partially clarify the vagueness as to that reference, Am. Compl. ¶ 11, David does not allege "understanding[s] or agreement[s]" with those parties that were interfered with, *Ethan Allen*, 647 So. 2d at 815. To the extent there were

15

business relationships in addition to David's job offer from Peraton that GD interfered with, he must specify as such when repleading and divide those new claims into separate counts.

### C. Count V (Aiding and Abetting Defamation and Tortious Interference with a Business Relationship)

GD lastly argues that David's claim for aiding and abetting fails for the reasons above, and also that it is a shotgun pleading because it commingles two claims. MTD at 19–22. David repeats his arguments to GD's aforementioned points and contends that his allegations give GD sufficient notice such that it is not a shotgun pleading. Resp. at 18–19.

The elements necessary to sustain a claim for aiding and abetting under Florida law are: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abett[o]r; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1321 (M.D. Fla. 2013) (quoting *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (per curiam)).

16

David's aiding and abetting claim alleges two causes of action in one count and is therefore a shotgun pleading. David alleges that GD aided and abetted "tortious interference and defamation committed by Welch." Am. Compl. ¶ 70. The comingling of two underlying torts in one claim fails to separate into different counts "each cause of action or claim for relief." *Weiland*, 792 F.3d at 1323; *see Taubenfeld v. Lasko*, 324 So. 3d 529, 541–44 (Fla. 4th DCA 2021) (analyzing aiding and abetting claims with different underlying torts separately). Without specifying which allegations support which underlying tort, the claim fails to give GD "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

In sum, David must separately allege each cause of action for aiding and abetting based on the distinct underlying torts.

Accordingly, the following is **ORDERED**:

1. Defendant General Dynamic International Technology's Motion to Dismiss the Amended Complaint (Doc. 76) is **GRANTED IN PART** and **DENIED IN PART.**

2. Counts IV and V are **DISMISSED WITHOUT PREJUDICE.**

17

3. Plaintiff Matthew J. David may file an amended complaint to address this order's concerns no later than **July 30, 2025**.

4. The parties must file an amended Case Management Report no later than **August 12, 2025**.

**ORDERED** in Tampa, Florida, on July 15, 2025.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge